DIANE P. DEMING *v.* NATIONWIDE MUTUAL
INSURANCE COMPANY ET AL.

ROBERT H. BARDIN *v.* NATIONWIDE MUTUAL
INSURANCE COMPANY ET AL.

EDWARD J. MCMAHON *v.* NATIONWIDE MUTUAL
INSURANCE COMPANY ET AL.
(SC 17459)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued May 19—officially released September 5, 2006

*Richard P. Weinstein*, with whom was *Nathan A. Schatz*, for the appellants (plaintiff in each case).

*Michael D. Blanchard*, with whom were *Deborah S. Freeman* and, on the brief, *Ann M. Siczewicz*, for the appellees (named defendant et al. in each case).

*Opinion*

KATZ, J. The plaintiffs in this joint appeal, Diane P. Deming, Robert H. Bardin and Edward J. McMahon, individually brought actions against the defendants, six companies affiliated with Nationwide Insurance Com-

pany (Nationwide),[1] alleging that the defendants wrongfully had withheld policy renewal commissions and deferred compensation, valued by the plaintiffs at more than $2 million collectively,[2] which were owed to them after the termination of their relationship as insurance agents for the defendants. The plaintiffs appeal from the judgments of the trial court rendering summary judgment in favor of the defendants on the plaintiffs' claims of conversion, theft, breach of contract and violations of the Connecticut Unfair Trade Practices Act, General Statutes §§ 42-110a through 42-110q (CUTPA). With respect to the deferred compensation, the plaintiffs' principal claim is that the trial court improperly concluded that a provision in their contracts, under which they would forfeit their deferred compensation if they engaged in certain competitive conduct after cancellation of the contract, was a valid forfeiture for competition clause and not an unreasonable covenant not to compete. With respect to the renewal commis-

---

[1] In their complaints, the plaintiffs named the following Nationwide companies as defendants: Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life and Annuity Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide General Insurance Company and Nationwide Life Insurance Company. The plaintiffs initially also named as defendants Steven T. Miles, a sales manager for the Nationwide companies, and James U. Shortly, an associate vice president of the Nationwide companies. Thereafter, Miles and Shortly filed a motion to strike the claims against them, which the trial court granted. We, therefore, refer to the Nationwide companies as the defendants.

[2] In their affidavits, the plaintiffs attested that the following amounts in deferred compensation had accrued in their respective accounts held by the defendants at the time of their terminations: $158,000 in Deming's account; $460,412 in Bardin's account; and $825,690 in McMahon's account. The plaintiffs further attested that the defendants owed to them the following approximate amounts in renewal commissions: $145,196 to Deming; $180,876 to Bardin; and $407,700 to McMahon.

We note with respect to the benefits we refer to as deferred compensation, the plaintiffs refer to those benefits as "retirement benefits," whereas the defendants refer to them as "agent security compensation program benefits." We use the term deferred compensation because that is the term that the contract most frequently employs when referring to the benefit.

sions, the plaintiffs claim that the trial court improperly concluded that the counts pertaining to the commissions were time barred and that the defendants' failure to pay the commissions in accordance with General Statutes § 38a-709 (c)[3] did not constitute conversion, theft or a breach of contract as a matter of law. We conclude that the trial court improperly rendered summary judgment in favor of the defendants on the plaintiffs' claims for breach of contract as to both the deferred compensation and the renewal commissions, and on their claim for violations of CUTPA. Accordingly, we reverse the trial court's judgments as to those counts and affirm the judgments as to the conversion and theft counts.

---

[3] General Statutes § 38a-709 provides: "(a) Any insurance company authorized to transact fire or casualty business in this state shall, upon termination of a producer's appointment by said company, permit the renewal of all contracts of insurance written by such producer for a period of eighteen months from the date of such termination, as determined by the individual underwriting requirements of said company, provided, in the event of any contract not meeting such underwriting requirements, the company shall give the producer sixty days' notice of its intention not to renew said contract, and provided further that such period of time may be reduced, in whole or in part, as the commissioner may deem necessary for the purpose of adequately protecting the insured or securing the solvency of such company.

"(b) No insurance agency contract entered into in this state, by a licensed insurer with an insurance producer licensed under section 38a-769, shall be terminated by the licensed insurer appointing such producer unless the licensed insurer upon terminating such contract shall give not less than ninety days' written notice in advance to the other party unless the contract shall be terminated by the licensed insurer for failure of the producer, after receiving a written demand, to pay over moneys due to such insurer, provided during said ninety-day period after any such notice, the producer shall not write or bind any new business on behalf of the licensed insurer without the specific written approval by such insurer of such business.

"(c) Any insurance company renewing contracts of insurance in accordance with this section shall pay commissions for such renewals to the terminated producer in the same amount as had been paid to him on similar policies during the twelve months immediately preceding the notice of termination.

"(d) The provisions of this section shall not apply to any contract with a producer for the sale of life or accident and health insurance."

The record reveals the following undisputed facts and procedural history. The plaintiffs are licensed to sell various types of insurance in Connecticut. Bardin, McMahon and Deming respectively began their employment relationship with the defendants in 1972, 1980 and 1983. Each plaintiff executed a contract with the defendants in which he or she was deemed an independent contractor and agreed to sell only Nationwide insurance products, except under certain conditions. Paragraph eleven of the contract set forth the terms for "Agency Security Compensation," one component of which was deferred compensation. In essence, this section provided that deferred compensation incentive credits would be calculated as a percentage of each agent's earnings. After five years of service, the deferred compensation would be payable, upon a qualified cancellation of the agreement,[4] following: retirement; death or permanent total disability; or cancellation of the agreement for any other reason. The exact amount of the accrued benefit to be paid depended on, inter alia, which circumstance had led to the qualified cancellation of the agreement. Paragraph 11 (f) of the contract set forth three events, principally relating to certain competitive conduct, that would cause the defendants' liability for deferred compensation to cease. See footnote 13 of this opinion for the text of paragraph 11 (f).

Thereafter, in letters dated November 3, 1999, January 1, 2000, and January 30, 2000, McMahon, Deming and Bardon, respectively tendered their resignations to the defendants.[5] The defendants thereafter notified

---

[4] Paragraph 11 (e) of the contract provides: "Unless you have induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force with the [c]ompanies, the cancellation of this [a]greement shall be a qualified cancellation for the purpose of this [a]greement."

[5] The plaintiffs claim that the facts surrounding their individual departures differed, specifically, that Bardin and Deming constructively were terminated and McMahon was forced by the defendants to sign a letter of resignation that the defendants had drafted. Although these facts would be relevant

each plaintiff that they were canceling his or her agent agreement and intended to enforce the forfeiture provision, if applicable. After terminating their relationship with the defendants, the plaintiffs continued to work from their existing offices as insurance agents, selling other insurance companies' products.

On December 5, 2002, after the defendants failed to pay the deferred compensation that had accrued in McMahon's account, McMahon commenced an action against the defendants. On January 2, 2003, Bardin and Deming individually commenced actions against the defendants, alleging facts and claims essentially identical to those in McMahon's complaint. In their fourth amended complaint,[6] filed on August 16, 2004, the plaintiffs asserted nine counts. Three counts related to the defendants' control over and access to the plaintiffs' "book of business,[7] including the renewals in violation of [§] 38a-709 (c)": misappropriation (conversion); theft in violation of General Statutes § 52-564;[8] and breach of contract, including the covenant of good faith and fair dealing. Three counts related to the defendants'

to the plaintiffs' claim that the forfeiture clause is unenforceable because they did not voluntarily terminate their relationships with the defendants; see footnote 14 of this opinion; in light of our conclusion reversing the trial court's judgment as to the validity of that clause; see part I A of this opinion; and the insufficient record that would preclude review of this claim, we need not address this issue.

[6] Although the plaintiffs individually filed complaints, and the defendants filed separate motions addressing each of these complaints, because each of the filings were identical and the trial court issued a joint ruling on the motions, for purposes of clarity, we refer to the complaints and motions in the singular.

[7] The plaintiffs' complaint described the "book of business" as including "the name and address of the insured together with the type of insurance purchased, the amount of coverage, the premium and most particularly the expiration. The expiration date becomes a key date to trigger renewal solicitations."

[8] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

failure to pay the deferred compensation: misappropriation (conversion); theft; and breach of contract. Finally, the plaintiffs asserted counts alleging tortious interference with business relationships, wanton infliction of emotional distress, and violations of CUTPA predicated on the conduct alleged in the other counts.

Thereafter, the defendants moved for summary judgment. The trial court rendered summary judgment in favor of the defendants on all counts except the third count, alleging tortious interference, and the ninth count, to the extent that the CUPTA violation was predicated on the tortious interference count. Specifically with respect to the counts based on the defendants' failure to pay deferred compensation, the trial court concluded that, under the plain language of the contract, the plaintiffs were not entitled to the funds because they had worked in the insurance business under circumstances that violated paragraph 11 (f) of the contract, which the court determined was a valid forfeiture for competition clause. The trial court rejected the plaintiffs' challenge to the reasonableness of the restrictions therein, noting that several other courts had analyzed that same clause and had found it to be reasonable under the traditional test applied to restrictive covenants. The court concluded that it did not need to consider the reasonableness of all of the restrictions under paragraph 11 (f) because the plaintiffs had to engage in only one of the conditions to trigger the forfeiture, and the contract contained a severability provision.

The plaintiffs then filed a motion for reconsideration of the summary judgment ruling and/or motion for leave to amend the complaint, and a motion for a determination to allow an immediate appeal, pursuant to Practice Book § 61-4. The court denied the motion for reconsideration and for a § 61-4 determination, but granted leave to amend the complaint.

On February 9, 2005, the plaintiffs filed a fifth amended complaint, the operative complaint for purposes of this appeal. Therein, the plaintiffs revised the allegations in support of the three counts relating to their book of business to assert specifically that these counts of conversion, theft and breach of contract were predicated on the defendants' failure to pay renewal commissions. They also revised the CUTPA count to incorporate these allegations. The plaintiffs simply repleaded their allegations from the fourth amended complaint as to the three counts related to deferred compensation (misappropriation, theft and breach of contract) on which the court had granted summary judgment in order to preserve those counts for appellate review. The plaintiffs thereafter abandoned the count alleging infliction of emotional distress and withdrew the count alleging tortious interference on which the trial court previously had denied summary judgment.

The defendants then filed a supplemental motion for summary judgment as to the revised counts, which the trial court granted. The court concluded that the revised counts pertaining to the renewal commissions were time barred because the fifth amended complaint had been filed after the applicable three year limitations period had expired,[9] and the claims did not relate back to the fourth amended complaint, which had been filed timely.[10] In support of its conclusion that the claims did

---

[9] It is undisputed that all of the counts, except the breach of contract counts, were governed by a three year statute of limitations. See General Statutes § 42-110g (f) (CUTPA); General Statutes § 52-577 (torts). Although contract actions generally are governed by a six year statute of limitations; see General Statutes § 52-576; it also is undisputed that the contracts at issue prescribed a three year limitations period for claims arising thereunder.

[10] It is unclear from the record precisely what event the trial court and parties agreed had commenced the running of the limitations period. Nonetheless, the plaintiffs do not dispute that the allegations in the fifth amended complaint must relate back to the fourth amended complaint in order to proceed in this action.

not relate back, the court determined that the plaintiffs' fourth and fifth amended complaints asserted different theories: the fourth amended complaint alleged that the defendants had engaged in wrongdoing with respect to their control over and access to the plaintiffs' book of business, containing their list of customers and policy expiration dates, whereas the fifth amended complaint alleged that the defendants had engaged in wrongdoing with respect to their failure to pay renewal commissions as required by § 38a-709. The court characterized the plaintiffs' reference in their earlier complaint to the defendants' "misappropriation of the plaintiffs' book of business, including the renewals in violation of . . . [§] 38a-709," as essentially an afterthought to the statute and unsupported by any facts that would tend to prove the underlying elements of any cause of action under the statute.

The court also stated several alternative grounds to support its decision. First, with respect to the claims for conversion and theft of the renewal commissions, the plaintiffs never had alleged that they owned or ever were in possession of the funds, and thus the claim was only for money owed, which is insufficient to establish conversion or theft. Second, with respect to the breach of contract claim for failure to pay the commissions, the contract did not require that payment expressly, and thus the plaintiffs were seeking to hold the defendants liable for violating an implied covenant of an implied contractual provision, a claim legally insufficient to state a cause of action.[11] Accordingly, the trial court

---

[11] The trial court previously had noted at oral argument on the defendants' first motion for summary judgment that it was of the view that a failure to pay for renewal commissions under § 38a-709 could be enforced by the insurance commissioner and the attorney general under General Statutes § 38a-16.

rendered judgments in favor of the defendants. This joint appeal followed.[12]

The plaintiffs claim that the trial court improperly rendered summary judgment. With respect to the counts alleging conversion, theft and breach of contract relating to the deferred compensation, they contend that paragraph 11 (f) of the contract, under which they forfeited that compensation, is unenforceable because: (1) it is an unreasonable restriction on competition, rather than a valid forfeiture for competition clause; and (2) they did not leave their employment voluntarily, but constructively were terminated without cause. With respect to their counts alleging conversion, theft and breach of contract relating to the renewal commissions, the plaintiffs contend that: (1) the claims are not time barred because the allegations in the fifth amended complaint relate back to the fourth amended complaint; (2) the failure to pay renewal commissions can be enforced in an action for conversion and theft; and (3) the failure to pay the commissions in accordance with § 38a-709 constitutes a breach of the contract and the implied covenant of good faith and fair dealing. Finally, because their CUTPA count is predicated on the viability of these other counts, the plaintiffs claim that the trial court also improperly rendered summary judgment as to this count.

The defendants respond that the trial court properly rendered summary judgment in their favor with respect to the counts relating to the deferred compensation because: (1) paragraph 11 (f) of the plaintiffs' contract is a valid forfeiture for competition clause and thus not subject to a traditional covenant not to compete analysis, but that even if subject to such an analysis,

---

[12] The plaintiffs appealed from the judgments of the trial court to the Appellate Court, and we then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

it is reasonable; (2) constructive discharge does not provide a basis for invalidating an otherwise valid forfeiture for competition clause; and (3) the failure to pay the deferred compensation cannot support a claim for conversion or theft. The defendants also contend that summary judgment properly was rendered on the counts alleging conversion, theft and breach of contract with respect to their failure to pay renewal commissions under § 38a-709 because: (1) those claims are time barred; (2) the renewal commissions cannot be the subject of a conversion or theft cause of action; and (3) § 38a-709 cannot be engrafted as a term of the contract. Given the trial court's proper conclusions as to these counts, the defendants contend, the trial court also properly rendered summary judgment on the dependent CUTPA count.

We agree with the plaintiffs that paragraph 11 (f) of the contract must be analyzed for reasonableness as a restrictive covenant not to compete and that reasonableness could not be determined as a matter of law. We also agree with the plaintiffs that the defendants did not demonstrate that the failure to pay renewal commissions under § 38a-709 could not constitute a breach of the contract. We conclude, however, that the plaintiffs' claims of conversion and theft as to the nonpayment of both the deferred compensation and the renewal commissions cannot be sustained as a matter of law. Accordingly, we reverse in part the judgments of the trial court as to the two breach of contract counts for failure to pay deferred compensation and failure to pay renewal commissions and as to the CUTPA count to the extent that it is predicated on the breach of contract counts.

In analyzing the merits of the appeal, we apply our well established standard for reviewing a grant of summary judgment. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the

pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . A material fact . . . [is] a fact which will make a difference in the result of the case. . . . Finally, the scope of our review of the trial court's decision to grant the [defendants'] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 278 Conn. 305, 314, 898 A.2d 777 (2006).

I

DEFERRED COMPENSATION

The defendants' obligation to pay to the plaintiffs the deferred compensation that had accrued in their respective accounts under the terms of paragraph eleven of their contracts is at issue in counts six, seven and eight of the complaint, respectively alleging conversion, theft and breach of contract. The dispositive issues are whether the forfeiture provision is enforceable and, if so, whether the conduct alleged can support claims of conversion and theft. We address each of these in turn.

A

More specifically stated, the first issue we must address is whether the trial court properly determined that, because the plaintiffs, following the termination of their business relationships with the defendants, had

engaged in conduct described in paragraph 11 (f) of their employment contracts,[13] the defendants properly withheld payment of approximately $1.44 million in deferred compensation that had accrued in the plaintiffs' accounts. See footnote 2 of this opinion. In reaching that determination, the trial court rejected the plaintiffs' claim that paragraph eleven constitutes a covenant not to compete, which must be measured against Connecticut's policy against unreasonable restrictive covenants;[14] see *Robert S. Weiss & Associates, Inc.* v.

[13] Paragraph 11 (f) of the contract provides: "Cessation of Agency Security Compensation.

"All liability of the [c]ompanies for [a]gency [s]ecurity [c]ompensation provided for in paragraph [eleven] and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur:

"(1) You either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a [twenty-five] mile radius of your business location at that time; or

"(2) You fail to return in good condition, within ten days, all materials, records, and supplies furnished to you by the [c]ompanies during the course of this [a]greement, together with any copies thereof; or

"(3) After cancellation of this [a]greement, you directly or indirectly induce, attempt to induce, or assist anyone else in inducing or attempting to induce policyholders to lapse, cancel, or replace any insurance contract in force with the [c]ompanies; furnish any other person or organization with the name of any policyholder of the [c]ompanies so as to facilitate the solicitation by others of any policyholder for insurance or for any other purpose."

[14] As we previously have noted, in addition to their claim that the covenant should not be enforced because its provisions are unreasonable and a violation of Connecticut's public policy, the plaintiffs also maintain that whether the covenant was reasonable depended upon the circumstances of their discharge. Recognizing our statement in *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 532, 546 A.2d 216 (1988), that "the reasonableness of a restrictive covenant of employment does not turn on whether the employee subject to the covenant left his position voluntarily or was dismissed by the employer," the plaintiffs claimed that the case on which *Wiederlight* relied, specifically, *Kroeger* v. *Stop & Shop Cos.*, 13 Mass. App. 310, 320, 432 N.E.2d 566, appeal denied, 386 Mass. 1102, 440 N.E.2d 1175 (1982), provided an exception when the discharge was "inequitable." Because the trial court in the present case determined that paragraph eleven

*Wiederlight*, 208 Conn. 525, 532, 546 A.2d 216 (1988); treating it instead as a forfeiture provision, the violation of which, by the plaintiffs' posttermination competition, contractually extinguished the defendants' obligation to pay the benefits. Interpreting the clause not as a restrictive covenant but instead as a provision that simply offered the agent a choice and a monetary benefit upon compliance, the trial court expressly determined that it "need not examine this clause for reasonableness."[15] Finally, citing to *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 451, 747 A.2d 1017 (2000), wherein this court had held that a forfeiture for competition clause was valid, the trial court rendered summary judgment for the defendant. We conclude that, because the provision was, in essence, a restrictive covenant, the trial court improp-

---

of the contract was a forfeiture provision, not a covenant not to compete, it did not address the plaintiffs' claim that their constructive discharge; see *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 178, 717 A.2d 1254 (1998) (defining constructive discharge); and/or improper termination rendered paragraph eleven unenforceable. Accordingly, the trial court made no findings that would allow us to assess whether the plaintiffs improperly were discharged, and we, therefore, do not issue any advisory opinion pertaining to that claim.

[15] The trial court nevertheless did make a reasonableness assessment as to subsection (f) (1) of paragraph eleven of the contract, summarily concluding, based on case law from other jurisdictions as to the same provision, that the restriction was reasonable as a matter of law, but thereafter concluding that it was not required to decide the reasonableness of subsection (f) (3). In the vast majority of cases, however, whether a covenant is reasonable is a question of fact. "Per se rules of illegality should be applied only to conduct which is shown to be manifestly anticompetitive. . . . Consequently, the actual impact of particular arrangements on competition must be examined to determine whether they have a pernicious effect on competition and lack . . . any redeeming virtue." (Citation omitted; internal quotation marks omitted.) *Elida, Inc.* v. *Harmor Realty Corp.*, 177 Conn. 218, 231, 413 A.2d 1226 (1979); see also *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 529 n.2 (requiring court, in evaluating reasonableness of covenant not to compete, to weigh five fact bound considerations). In our view, paragraph 11 (f) (1) does not fall within the limited category of restrictive covenants that can be deemed reasonable as a matter of law.

erly failed to examine whether there were material issues of fact related to its reasonableness as to these parties and therefore improperly rendered summary judgment for the defendants.

We first turn to our well established jurisprudence regarding contract interpretation. "Whe[n] the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000).

For purposes of this first issue on appeal, there is little ambiguity in the terms of the contract in the present case. Under paragraph 11 (f) (1), if the plaintiffs engage in or are licensed as agents, solicitors, representatives, or brokers or in anyway are connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a twenty-five mile radius of their business locations, they forfeit their deferred compensation. Similarly, under paragraph 11 (f) (3), if they directly or indirectly induce, attempt to induce, or assist anyone else in inducing or attempting to induce policyholders to lapse, cancel, or replace any insurance contract in force with the defendants, or furnish any other person or organization with the name of any of the defendants' policyholders so as to facilitate the solicitation by others of any policyholder for insurance or any other purpose, they will forfeit their deferred compensation.[16] Therefore, to resolve the issue

---

[16] As we have noted previously, the trial court declined to consider subsection (f) (3) of paragraph eleven on the ground that the subsections were severable and independently enforceable. See footnote 15 of this opinion. Although we do not review this conclusion, in light of our determination

before us, we are not required to interpret the terms of this provision; rather, we must determine the nature and effect of the terms so that we know which rules to apply to determine the validity of the provision. In other words, we must first categorize or classify the provisions.

By definition, covenants by employees not to compete with their employers after termination of their employment restrain trade in a free market. See *Torrington Creamery, Inc.* v. *Davenport*, 126 Conn. 515, 519, 12 A.2d 780 (1940). Consequently, these covenants may be against public policy, and, thus, are enforceable only if their imposed restraint is reasonable, an assessment that depends upon the competing needs of the parties as well as the needs of the public. These needs include: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to earn a living; and (3) the public's need to secure the employee's presence in the labor pool. See *Scott* v. *General Iron & Welding Co.*, 171 Conn. 132, 137, 368 A.2d 111 (1976). In the present case, the contract does not require an employee's *express* promise not to compete after termination of employment; instead, it requires a forfeiture of the employee's benefits if he or she engages in competition after termination of employment. Therefore, we consider whether this distinction removes the forfeiture provision from the restraint of trade category and, accordingly, eliminates the need to determine whether the provision is reasonable.

that the trial court improperly failed to analyze paragraph eleven under the reasonableness test applied to noncompete covenants, we nevertheless note that the unlimited duration of the restraint therein underscores the necessity of such an analysis. See *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 530 (noting that "time and geographic restrictions in a covenant not to compete are valid if they are reasonably limited and fairly protect the interests of both parties").

This court has not decided whether a forfeiture provision like the one in issue in the present case is, in effect, a covenant not to compete. Other jurisdictions have examined the issue, however, and two views have emerged. According to the majority view, such a forfeiture provision is not a restraint of trade and, thus, the court need not scrutinize the provision to determine whether it is reasonable. See, e.g., *Rochester Corp.* v. *Rochester*, 450 F.2d 118, 123 (4th Cir. 1971); *Van Pelt* v. *Berefco, Inc.*, 60 Ill. App. 2d 415, 428, 208 N.E.2d 858 (1965); *Hudson* v. *North Carolina Farm Bureau Mutual Ins. Co.*, 23 N.C. App. 501, 503–504, 209 S.E.2d 416 (1974), cert. denied, 286 N.C. 414, 211 S.E.2d 217 (1975); *Dollgener* v. *Robertson Fleet Services, Inc.*, 527 S.W.2d 277, 280 (Tex. Civ. App. 1975), and cases cited therein; annot., 18 A.L.R.3d 1246 (1968). These courts reason that the forfeiture, unlike the restraint included in an employment contract, does not prohibit employees from engaging in competitive work, but merely denies them the right to participate in the retirement plan if they do so engage. *Rochester Corp.* v. *Rochester*, supra, 123. Thus, the employees are not necessarily prohibited from earning a living in their chosen vocation or trade nor is the public necessarily deprived of the employees' skills and services.[17]

---

[17] One court explained and cautioned: "The rationale for viewing a forfeiture condition with a kind eye is that, unlike enforcing a covenant by way of an injunction, enforcing a forfeiture condition merely requires a former employee to forfeit a monetary benefit upon entering competition with his or her former employer. See *Sarnoff* v. *American Home Products Corp.*, 798 F.2d 1075, 1083 (7th Cir. 1986). This distinction becomes much more subtle, however, when the forfeiture becomes significantly large." *Durapin, Inc.* v. *American Products, Inc.*, 559 A.2d 1051, 1056 n.5 (R.I. 1989). For the reasons we state later in this opinion, the difference between enforcing a forfeiture of benefits condition and enforcing a covenant not to compete by way of damages is negligible, especially when the rights to be forfeited have been earned and vested. Moreover, the fact of the amount of the forfeiture should not determine the category of the condition, but, rather, should become a relevant consideration as to the reasonableness of that condition.

"A significant minority of jurisdictions, however, have adopted a different position. They hold that the threat of economic loss to an employee should he engage in business competition is a restraint of trade.[18] See *Food Fair Stores, Inc.* v. *Greeley,* 264 Md. 105, 117–19, 285 A.2d 632 (1972); *Almers* v. *South Carolina [National] Bank of Charleston,* 265 S.C. 48, 59, 217 S.E.2d 135 (1975); *Holsen* v. *Marshall & Ilsley Bank,* 52 Wis. 2d 281, 287–88, 190 N.W.2d 189 (1971). These courts reason that . . . [a]lthough the agreement is not expressed as a restriction against competition by the employee, its undoubted object and effect is that of a powerful deterrent to the employee's exercise of the right to compete, particularly where . . . the penalty involved is a substantial sum of money." (Internal quotation marks omitted.) *Grebing* v. *First National Bank of Cape Girardeau,* 613 S.W.2d 872, 875 (Mo. App. 1981).

The plaintiffs maintain that, because the defendants' deferred compensation plan, which supplemented the commissions earned by the plaintiffs based on their sale and servicing of the defendants' products, was part of their employment contracts, a provision that they forfeit their accrued benefits for competing with the defendants is a restraint against competition to which the reasonableness standard applies. Although federal decisions from Connecticut are not binding on this court; *Turner* v. *Frowein,* 253 Conn. 312, 341, 752 A.2d

---

[18] We note that there also are a few jurisdictions that do not fit squarely within either approach, in that they label contract provisions like the one at issue in this case a forfeiture clause, but nevertheless subject them to a reasonableness analysis. See, e.g., *Brockley* v. *Lozier Corp.,* 241 Neb. 449, 460, 488 N.W.2d 556 (1992) ("[w]e find that forfeitures of deferred compensation are enforceable, but that they will be treated in the same manner as covenants not to compete, and therefore, the conditions making the forfeitures enforceable must be reasonable"). In the present case, the parties' briefs suggest that the label is determinative; in other words, no party is advocating that a reasonableness test be administered even if it is deemed a forfeiture for competition provision.

955 (2000) ("[d]ecisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive"); this was, in essence, the determination made as to the same defendants presently before us in *Harlow* v. *Nationwide Mutual Ins. Co.*, United States District Court, Docket No. 84-503, 1987 U.S. Dist. LEXIS 8419 (D. Conn. July 23, 1987), wherein the District Court had evaluated contract provisions regarding forfeiture of the defendants' deferred compensation benefits like the ones at issue in the present case. The District Court concluded that the provision forbidding the agent "from engaging in the insurance business at all for one year within a twenty five mile radius of his former agency" was a "restriction [that] reasonably serves the objective of protecting [the defendant's] interests in its present customers," but that "the second noncompetition provision of the agreement absolutely forbid[ding] [the plaintiff] from soliciting any of his Nationwide customers without any limitation whatsoever as to duration . . . goes beyond what is necessary to protect the company's interest in its business." Id., *11. Accordingly, the District Court concluded that "the provision . . . violates public policy under Connecticut law, and is therefore void." Id., *11–12.

Similarly, in three other cases involving Nationwide insurance companies in which courts from other jurisdictions have been asked to consider contract provisions regarding forfeiture of such deferred compensation benefits, the courts have termed them "noncompetition" clauses and in turn have assessed them for reasonableness.[19] In *Hamilton Ins. Services*,

---

[19] We note, however, that there are a few jurisdictions that follow the majority approach, under which forfeiture provisions are not viewed as a restraint of trade, specifically when considering the forfeiture provision in Nationwide contracts. See, e.g., *Fraser* v. *Nationwide Mutual Ins. Co.*, 334 F. Sup. 2d 755, 760 (E.D. Pa. 2004) (wherein District Court determined that similar provision imposed by defendant insurer "was more akin to an incentive program than a non-compete clause").

*Inc.* v. *Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 274–75, 714 N.E.2d 898 (1999), the Ohio Supreme Court examined the contract that governed the relationship between the defendants and the plaintiff agent, focusing on what the court termed "[a] noncompetition clause." In that case, it was noted in the prior history of the case, that the agreement provided that the insurance agent was entitled to certain benefits, known as agency security compensation, upon termination of the agreement, regardless of the reason for the termination. The noncompetition clause, however, provided for the forfeiture of those benefits if the agent decided to compete with Nationwide within a twenty-five mile radius in the first year following termination. See id., 271. The principal issue in *Hamilton Ins. Services, Inc.*, was whether the operative contract was clear and unambiguous, thereby allowing Nationwide to terminate the agreement without cause. Id., 273. The trial court had determined that the contract was ambiguous; id.; and that the noncompetition clause contained in the agreement was unconscionable. Id., 274. The Ohio Court of Appeals had agreed that the agreement was ambiguous and that the trial court properly allowed evidence on the issue of whether Nationwide could terminate the agent without cause. Id., 273. The Court of Appeals did not agree with the determination by the trial court, however, that the noncompetition clause was unconscionable, instead concluding that the clause was unenforceable because the defendants had breached the terms of the contract. Id., 274. The Ohio Supreme Court disagreed with the determination by the Court of Appeals that the defendants had breached the terms of the contract, and therefore proceeded to examine the terms of the noncompetition clause to determine if it was valid and enforceable. Id. The court reasoned in doing so: "A noncompetition clause is reasonable if the restraint is no greater than necessary for

the protection of the employer, does not place undue hardship on the employee, and is not injurious to the public. . . . Here, the clause in question contained a restriction disallowing competition within a twenty-five-mile radius and one year of termination. We agree with the determination of the [C]ourt of [A]ppeals that this is a reasonable restriction. Therefore, we conclude that Nationwide did not breach the [contract] and hold that the noncompetition clause is valid and enforceable." (Citation omitted.) Id., 274–75.

In *James H. Washington Ins. Agency* v. *Nationwide Mutual Ins. Co.*, 95 Ohio App. 3d 577, 588, 643 N.E.2d 143 (1993), the plaintiff insurance agent had claimed that the provision was unreasonable and that it should not be enforced by the court. In the alternative, the agent claimed that he "substantially" had complied with paragraph 11 (f) because, "on several occasions . . . [he] encouraged policyholders to continue their business with Nationwide," and thus, had not competed directly with the defendants. (Internal quotation marks omitted.) The Ohio Court of Appeals noted that it had "previously reviewed in other Nationwide cases the reasonableness of the noncompetition clause set forth in paragraph 11 (f) (1) . . . and determined Nationwide's policy of preventing an agent from working for or representing another insurance company, following termination for one year and within twenty-five miles is valid and enforceable. . . . [T]he restriction impos[es] no undue hardships on an agent . . . . The noncompetition provisions are not unreasonable or in illegal restraint of trade because [the agent] is not barred from practicing his profession. Rather, he is being denied a reward that is intended only for agents who are loyal to Nationwide." (Citations omitted.) Id.

In *Cray* v. *Nationwide Mutual Ins. Co.*, 136 F. Sup. 2d 171, 179 (W.D.N.Y. 2001), the District Court examined paragraph 11 (f) and held that, when an employee is

terminated without cause, a provision in his employment contract calling for forfeiture of his pension benefits is unreasonable as a matter of law, but that when the termination is for cause, the provision is not per se invalid. Although there was a dispute of fact as to whether the termination had been for cause that precluded summary judgment, the court nonetheless evaluated the reasonableness of the provision at issue, concluding that it was reasonable. Id., 180.

We conclude that the provision in the contract at issue in the present case, under which deferred compensation accrued under the agency security compensation plan is forfeited if the employee engages in a competing business, does not differ meaningfully from a covenant not to compete. The total prohibition against competition, enforced by a forfeiture of accrued benefits, subjecting the employee to an economic loss undoubtedly is designed to deter competition. *Holloway* v. *Faw, Casson & Co.*, 319 Md. 324, 333, 572 A.2d 510 (1990). We recognize that paragraph 11 (f) "does not restrain [the plaintiff's] rights to future employment in the sense that it does not present the classic situation wherein the employee, by assuming a position in a competitive field exposes himself to a suit by the employer for breach of contract or by way of a bill for injunctive relief." *Food Fair Stores, Inc.* v. *Greeley*, supra, 264 Md. 116. Here, the plaintiffs are free to engage in competition without restraint or interference by the defendants, but they are not free to do so and receive the deferred compensation benefits. Therefore, "whether the restraint on the employee is by way of an employment contract arming the employer with legal sanctions or by virtue of a pension plan, which holds over the employee the loss of benefits should he compete, in either instance, the employee is subject to an economic loss should he breach the restrictive covenant." Id.

Accordingly, we agree with the plaintiffs that the provision in the present case, requiring that an agent forfeit his or her interest in the plan for competing with the defendants is, for all intents and purposes, a restraint against competition to which the reasonable standard applies. Although paragraph 11 (f) is not a *direct* restraint of trade in that the plaintiffs are not precluded from engaging in their chosen profession, we are persuaded that the consequences of forfeiture, at the very least, "enkindle a restraining influence, albeit in a subtle fashion." *Almers* v. *South Carolina National Bank of Charleston*, supra, 265 S.C. 51. Indeed, when, as in the present case, engaging in any one of the myriad proscribed acts under paragraph eleven triggered the forfeiture of substantial sums of money that the plaintiffs accumulated over the course of their careers, although such a restraint may be indirect, its effect hardly can be deemed subtle.[20]

Permitting a forfeiture clause that is not subject to a reasonableness assessment is essentially no different than enforcing a covenant not to compete, which, not properly circumscribed, is the classic example of a direct restraint. We would be unduly formalistic if we were to invalidate a covenant not to compete that was in direct restraint of trade, but approve a forfeiture provision that indirectly accomplished the same result. Our discussion herein illustrates that a covenant not to compete and a forfeiture upon competing are "but alternative approaches to accomplish the same practical result. Therefore, we would not substitute the reasoning of the pure logician for the realities of the business world and embark on a separate course of treatment for covenants not to compete and forfeiture

---

[20] We recognize that the plaintiffs actually were not restrained completely from engaging in certain of these proscribed anticompetitive acts; that fact, however, properly comes into play when analyzing the reasonableness of the restraint itself. See footnote 15 of this opinion.

provisions. When pruned to their quintessence, they tend to accomplish the same results and should be treated accordingly." Id., 59.

Therefore, we disagree with the trial court's conclusion that paragraph 11 (f) is a valid forfeiture for competition clause and conclude that it must be analyzed under the reasonableness test for covenants not to compete. We further disagree with the trial court that the reasonableness of the clause can be determined as a matter of law. See footnote 15 of this opinion. Accordingly, we reverse the trial court's judgment rendering summary judgment on count eight, alleging breach of contract, and remand the matter for further proceedings to consider the reasonableness of the pertinent provisions of the contract at issue.[21]

## B

We next turn to the plaintiffs' claim that the trial court improperly concluded that the defendants were

---

[21] In light of our conclusion as to the validity of paragraph 11 (f), we need not address the plaintiffs' challenge as to whether the trial court improperly applied the "blue pencil" rule when concluding that the separate conditions of the forfeiture provision could be severed when assessing reasonableness. The "blue pencil" rule is used to strike an unreasonable restriction "to the extent that a grammatically meaningful reasonable restriction remains after the words making the restriction unreasonable are stricken." (Internal quotation marks omitted.) *A.N. Deringer, Inc.* v. *Strough*, 103 F.3d 243, 247 (2d Cir. 1996); see *Beit* v. *Beit*, 135 Conn. 195, 204–205, 63 A.2d 161 (1948) ("There is undoubtedly a strong tendency on the part of courts to regard as divisible restraints of trade which are unreasonable in the extent of area covered and to hold them invalid only so far as necessary for the protection of the covenantee, where the terms of the promise permit that to be done without clearly violating the intent of the parties. . . . A restrictive covenant which contains or may be read as containing distinct undertakings bounded by different limits of space or time, or different in subject-matter, may be good as to part and bad as to part. But this does not mean that a single covenant may be artificially split up in order to pick out some part of it that can be upheld. Severance is permissible only in the case of a covenant which is in effect a combination of several distinct covenants. Where the covenant is intended by the parties to be an entirety, it cannot properly be so divided by a court that it will be held good for a certain area but invalid for another; indeed . . . this would be to make an agreement for the parties

entitled to summary judgment on their counts of conversion and theft relating to the deferred compensation because there are genuine issues of material fact as to those counts. The plaintiffs contend that, because money can be the subject of conversion and theft, they have stated a sufficient legal basis for these counts. The defendants agree that specifically identifiable moneys can be a basis for such causes of action, but contend that a mere obligation to pay money cannot be enforced through such actions. The defendants also contend that the plaintiffs' conversion and theft claims fail on the merits because the defendants legally were not obligated to pay the funds under the express terms of the contract after the plaintiffs had engaged in conduct that triggered the forfeiture. We agree with the defendants.

"The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 43, 761 A.2d 1268 (2000). Thus, "[c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. . . . The term owner is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right. . . . It is not a technical term and, thus, is not confined to a person who has the absolute right in a chattel, but also applies to a person who

into which they did not voluntarily enter." [Citations omitted; internal quotation marks omitted.]).

has possession and control thereof." (Citation omitted; internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 329, 852 A.2d 703 (2004).

"Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from an owner. . . . Conversion can be distinguished from statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Citations omitted; internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 129 n.8, 851 A.2d 1142 (2004).

Under our case law, "[m]oney can clearly be subject to conversion. See *Devitt* v. *Manulik*, 176 Conn. 657, 662–63, 410 A.2d 465 (1979) (recovery of money wrongfully taken from joint survivorship bank account); *Dunham* v. *Cox*, 81 Conn. 268, 270–71, 70 A. 1033 (1908) (recovery of a sum of money entrusted to the defendant for payment to a third person); *Shelby Mutual Ins. Co.* v. *Della Ghelfa*, 3 Conn. App. 432, 445, 489 A.2d 398 (1985), aff'd, 200 Conn. 630, 513 A.2d 52 (1986) (recovery by insurer from insured's attorney pursuant to General Statutes [Rev. to 1979] § 38-325 [b]) . . . ." (Citations omitted.) *Omar* v. *Mezvinsky*, 13 Conn. App. 533, 536, 537 A.2d 1039, cert. denied, 208 Conn. 803, 545 A.2d 1101 (1988). Similarly, money can be the subject of statutory theft. See *Howard* v. *MacDonald*, supra, 270 Conn. 111 (unlawful transfer of funds from elderly wom-

an's bank account to defendant's bank account). The plaintiffs must establish, however, legal ownership or right to possession of specifically identifiable moneys. *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 650, 804 A.2d 180 (2002).

In *Macomber*, we cited approvingly case law from other jurisdictions setting forth the general rule that, "[a]n action for conversion of funds may not be maintained to satisfy a mere obligation to pay money. . . . It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." (Internal quotation marks omitted.) Id., quoting *National Union Fire Ins. Co. of Pittsburgh, PA* v. *Wilkins-Lowe & Co.*, 29 F.3d 337, 340 (7th Cir. 1994). Thus, "[t]he requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally. . . . A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." (Citations omitted.) *Belford Trucking Co.* v. *Zagar*, 243 So. 2d 646, 648 (Fla. App. 1970). Consistent with this rule, in our case law sustaining a cause of action wherein money was the subject of the conversion or theft, the plaintiffs in those cases at one time had possession of, or legal title to, the money.[22] See, e.g., *Devitt* v. *Manulik*, supra, 176 Conn. 662–63; *Dunham* v. *Cox*, supra, 81 Conn. 270–71.

---

[22] The plaintiffs in the present case attempt to distinguish *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 261 Conn. 620, claiming that the only issue in that case was whether the subject of the conversion claim was specific, identifiable money, a threshold they assert they have met in the present case. We disagree. The plaintiffs' claim in *Macomber* failed both because they could not point to specific, identifiable money and because they did not allege that they had legal title to, or possession of, that money. Id., 651.

Applying this rule to the case at hand, we conclude that the plaintiffs' claims of conversion and theft fail as a matter of law. They have not alleged, nor do they contend in their briefs to this court, that they ever possessed or owned legal title to these funds. At best, the defendants merely are obligated to pay the money. Indeed, although the plaintiffs' affidavits indicate that the funds at issue were held in separate accounts designated for each plaintiff, under the terms of the contract, the right to those funds did not vest in the plaintiffs until and unless their employment was terminated in accordance with the terms set forth therein. Our conclusion in part I A of this opinion that the forfeiture provision may be invalid if deemed unreasonable does not alter the fact that the plaintiffs legally are not entitled to those funds unless such a determination is made in their favor. Accordingly, the trial court properly rendered summary judgment on counts six and seven of the complaint.

## II

## RENEWAL COMMISSIONS

The plaintiffs also claim that the trial court improperly rendered summary judgment on the first, second and fifth counts of their complaint, respectively alleging conversion, statutory theft and breach of contract for the nonpayment of renewal commissions in accordance with § 38a-709. See footnote 3 of this opinion. Specifically, the plaintiffs contend that the trial court improperly concluded that the claims were time barred because the allegations in their fifth amended complaint did not relate back to those in their fourth amended complaint. They further contend that the defendants' failure to comply with the statutory requirement to pay renewal commissions constituted a breach of contract and a violation of the implied duty of good faith and fair dealing. Finally, they contend that the defendants'

failure to pay the renewal commissions provides a basis for conversion and theft. We agree with the plaintiffs that the counts relating to the renewal commissions in the fifth amended complaint relate back to the fourth amended complaint and thus are not time barred. We also agree that a violation of § 38a-709 may provide a legal basis for the plaintiffs' breach of contract claim. We reject, however, the plaintiffs' contention that the facts supporting the conversion and theft counts legally can sustain those causes of action.

A

We begin with the issue of whether the trial court properly determined that the allegations in the fifth amended complaint did not relate back to those in the fourth amended complaint and, therefore, were time barred. The plaintiffs contend that, although their earlier complaints alleged that the defendants had misappropriated their "book of business," they submitted evidence to the trial court to establish that this general term is understood in the insurance industry to include all existing policies serviced by the agent *and* the commissions that are generated by the renewal of those commissions. In support thereof, the plaintiffs point to the express reference in their earlier complaints to § 38a-709 (c), which mandates the payment of such renewal commissions for a prescribed period of time.

The defendants respond that these counts in the fifth amended complaint depend on different facts to prove a different theory of liability than those in the fourth amended complaint. The defendants point to the fact that, unlike the fifth amended complaint, the earlier complaints never referenced "renewal commissions," only "renewals," and never alleged that the plaintiffs were "producers" or had been terminated by Nationwide, which are required elements of a claim under

§ 38a-709. We agree with the plaintiffs that the claims relate back and, therefore, are not time barred.

"The relation back doctrine has been well established by this court. A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is stated. . . . Our relation back doctrine provides that an amendment relates back when the original complaint has given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, thereby serving the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims . . . ." (Internal quotation marks omitted.) *Alswanger* v. *Smego*, 257 Conn. 58, 64–65, 776 A.2d 444 (2001).

Mindful of this standard, we compare the allegations in the plaintiffs' fourth and fifth amended complaint. The fourth amended complaint sets forth the following allegations in relevant part: "4. In the insurance business there is a term called 'expirations' which refers to the expiration date of a customer's insurance policy. The agent safeguards [his or] her book of business which includes the name and address of the insured together with the type of insurance purchased, the amount of coverage, the premium and most particularly the expiration. The expiration becomes a key date to trigger renewal solicitations. . . . 6. Notwithstanding [the]

plaintiff's ownership of said book of business, the . . . defendants misappropriated the . . . book of business. 7. At the time of [the] plaintiff's termination . . . the plaintiff had been a Nationwide agent for a substantial period of time . . . . The plaintiff's sole means of earning a living was only as an insurance agent. . . . 9. [The defendants'] misappropriation of the plaintiff's book of business, including the renewals in violation of . . . [§] 38a-709 (c), caused loss and damage to the plaintiff."

The only substantive change to the fifth amended complaint was to paragraph nine, which was revised to allege in relevant part: "[The defendants] terminated [the] plaintiff as a Nationwide agent and then misappropriated that portion of [the] plaintiff's book of business, as described herein, in regard to fire and casualty insurance renewal commissions . . . [the] plaintiff was a producer, which includes an insurance agent like the plaintiff who is appointed by an insurer like the defendants to act on the insurer's behalf; [the] defendants renewed customers' contracts of insurance for fire and casualty insurance for which [the] plaintiff was recognized as the agent/producer who wrote said contracts of insurance at the time of [the] plaintiff's termination; the defendants have failed to account for renewal commissions generated by said renewals and ha[ve] failed to pay such amounts to [the] plaintiff as required by . . . [§] 38a-709 (c), all to the plaintiff's loss and damage."

In our view, the allegations in the fifth amended complaint that the defendants had failed to pay renewal commissions as required under § 38a-709 (c), although more specific and artfully drafted than those in the fourth amended complaint, relate back to the earlier complaint. The plaintiffs had alleged in the fourth amended complaint that their book of business contained the "expiration [of each policy that] becomes a key date to trigger renewal solicitations" and that the

defendants "misappropriat[ed] . . . the plaintiff's book of business, *including the renewals in violation of . . . [§] 38a-709 (c) . . . .*" (Emphasis added.) Section 38a-709 provides in relevant part: "(a) Any insurance company authorized to transact fire or casualty business in this state shall, upon termination of a producer's appointment by said company, permit the renewal of all contracts of insurance written by such producer for a period of eighteen months from the date of such termination . . . . (c) Any insurance company renewing contracts of insurance in accordance with this section shall pay commissions for such renewals to the terminated producer in the same amount as had been paid to him on similar policies during the twelve months immediately preceding the notice of termination. . . ." Thus, the only conduct to which the statute is directed is the renewal of policies after termination and the payment of renewal commissions resulting therefrom.

Although the allegations in the fourth amended complaint clearly were broader, as evidenced by the allegation that the misappropriation of the book of business "includ[ed] the renewals," indicating that the book of business was key to soliciting both new policies and renewals, the narrower focus in the fifth amended complaint does not preclude the allegations therein from relating back to the earlier complaint. Admittedly, it is not clear from the fourth amended complaint whether the plaintiffs were alleging that, as a result of the defendants' misappropriation of their book of business, the plaintiffs were unable to solicit their customers to renew expiring Nationwide policies or that the defendants were able to solicit the plaintiffs' former customers to renew expiring policies. In either case, however, the harm is identical—the loss of renewal commissions to which the plaintiffs claimed they were entitled under § 38a-709.

We also disagree with the defendants' contention that the plaintiffs' allegations referring to "renewals," rather than "renewal commissions," and "insurance agent" or "Nationwide agent," rather than "producer" are dispositive, especially given the express reference to § 38a-709.[23] "In Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 268 Conn. 463, 466 n.4, 845 A.2d 389 (2004).

Reading the plaintiffs' fourth amended complaint broadly, but reasonably, we conclude that the fifth amended complaint relates back to the fourth amended complaint. Therefore, the trial court improperly concluded that the claims were time barred.

---

[23] During the operative period for payment of the renewal commissions at issue in the present case, there was no statutory definition for "producer." Thereafter, in Public Acts 2001, No. 01-113, §§ 1, 42, made effective in September, 1, 2002, the legislature defined that term, as well as others, applicable to chapter 701a. See General Statutes § 38a-702a (6). Our conclusion that the plaintiffs' allegations that they were Nationwide agents or insurance agents were sufficient for purposes of the relation back doctrine is not intended to suggest that an insurance agent was the statutory equivalent to a "producer" prior to the enactment of § 38a-702a or that the plaintiffs fall within the statute as a matter of law, which are questions to be resolved upon further proceedings.

B

We turn, therefore, to the merits of the plaintiffs' conversion, theft and breach of contract counts relating to the nonpayment renewal commissions in accordance with § 38a-709. With respect to the conversion and theft counts, the plaintiffs assert identical contentions to those they had made in support of their conversion and theft counts relating to the nonpayment of deferred compensation. Similarly, the plaintiffs have not established, nor have they even alleged, that they ever had legal title to, or possession of, those commissions, a required legal element of such causes of action. See *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 261 Conn. 650. Therefore, for the same reasons we set forth in part I B of this opinion, the plaintiffs' allegations predicated merely on the failure to pay money owed cannot provide the basis for an action in conversion and theft with respect to the nonpayment of renewal commissions.

With respect to the breach of contract count, the plaintiffs claim that the trial court incorrectly determined that the contract imposes no express obligation on the defendants to pay renewal commissions and that the plaintiffs improperly were seeking to hold the defendants liable for an implied violation of an implied contractual provision. The plaintiffs contend that, because the contract specifically recognizes an agent's entitlement to renewal commissions, the posttermination rights under § 38a-709 must be considered incorporated therein as a matter of law. They, therefore, contend that the defendants' failure to pay the renewal commissions in accordance with § 38a-709 breached the terms of the contract and the implied covenant of good faith and fair dealing. The defendants maintain that the trial court properly rendered summary judgment because the contract is devoid of any promise by the defendants to pay the plaintiffs renewal commis-

sions. They similarly contend that the implied covenant of good faith and fair dealing does not provide a basis for the action given the absence of any express obligation.

Thus, the issue before us is not one of statutory construction, in that both parties proceed from the premise that the obligation to comply with § 38a-709 must arise from the contract itself. They differ, however, on the specificity of the obligation required in the contract to support a breach of contract action. We conclude that the trial court improperly rendered summary judgment because it is not certain as a matter of law that § 38a-709 is not an implied term of the contract.

We have explained that "[t]he law . . . is that 'statutes existing at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention.' *Ciarleglio* v. *Benedict & Co.*, 127 Conn. 291, 293, 16 A.2d 593 (1940); *Hatcho* [*Corp.*] v. *Della Pietra*, 195 Conn. 18, 21, 485 A.2d 1285 (1985). . . . Long ago, the United States Supreme Court added emphasis to the principle that the law subsisting at the time the contract is made governs as if expressly referred to in the agreement when it held that '[t]his principle embraces alike those which affect its validity, construction, discharge, and enforcement.' *Von Hoffman* v. *Quincy*, 71 U.S. (4 Wall.) 535, 550, 18 L. Ed. 403 (1866); see *Cislo* v. *Shelton*, 35 Conn. Sup. 645, 652, 405 A.2d 84 (1978)." *All Brand Importers, Inc.* v. *Dept. of Liquor Control*, 213 Conn. 184, 199, 567 A.2d 1156 (1989); accord 17A Am. Jur. 2d 357–59, Contracts § 371 (2004) ("Contracting parties are presumed to contract in reference to the existing law, and to have in mind all the existing laws relating to the contract, or to the subject matter thereof. All existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must

be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention.").

It is important to emphasize, however, the limitation of this principle to the extent that it "embraces alike those [laws] which affect [the contract's] *validity, construction, discharge, and enforcement.*" (Emphasis added; internal quotation marks omitted.) *All Brand Importers, Inc.* v. *Dept. of Liquor Control,* supra, 213 Conn. 199; see, e.g., *Rizzo Pool Co.* v. *Del Grosso,* 240 Conn. 58, 76–77 n.18, 689 A.2d 1097 (1997) ("whenever there is an attorney's fees clause in the commercial party's contract, that clause is subject to [General Statutes] § 42-150aa, and the contract must be read as incorporating that provision's 15 percent limitation"); *Sanghavi* v. *Paul Revere Life Ins. Co.,* 214 Conn. 303, 307, 572 A.2d 307 (1990) (concluding that income option rider to disability insurance policy was invalid because it violated insurance law under then General Statutes § 38-167, now General Statutes § 38a-483). Thus, although we incorporate a law as if an express term of the contract to construe the scope or validity of an obligation already embraced within the terms of the contract, we do not incorporate the law to create a substantive obligation where none previously had existed.[24] See *Hatcho Corp.* v. *Della Pietra,* supra, 195 Conn. 21 (Referencing the statute to construe an obligation in the contract but noting: "[A] court cannot import into the agreement a different provision nor can the construction of the agreement be changed to vary the

---

[24] There are, of course, circumstances in which the legislature mandates that certain contracts encompass a substantive obligation. See, e.g., General Statutes § 38a-335 (prescribing minimum coverage for insurance policies); General Statutes § 42a-2-314 (prescribing warranty of merchantability as implied term of contract); General Statutes § 42a-2-315 (prescribing implied warranty of fitness for particular purpose). In the present case, § 38a-709 does not require expressly that the contract incorporate renewal commissions as a term therein.

express limitations of its terms. . . . We assume no right to add a new term to a contract . . . ." [Citation omitted; internal quotation marks omitted.]).

We turn, therefore, to the parties' contract. It is undisputed that the contract does not reference expressly § 38a-709 or the subject of posttermination renewal commissions. Therefore, the question is whether the contract embraces any obligation on the defendants' part to pay renewal commissions such that § 38a-709 should be read as if it were an express term of the contract to determine the validity, construction, discharge, or enforcement of that obligation. The plaintiffs point to paragraph seven of the contract as evidence of such an obligation.

Paragraph seven of the contract, entitled "Compensation," provides in relevant part: "It is agreed that we will pay you any and all original and renewal commissions earned by you, but not credited to your account at the time of entering into this [a]greement, on business written by you while employed by us under our [a]gent's [e]mployment [a]greement. It is understood, however, that we may deduct from any compensation due you under this [a]greement any commissions previously credited to your account while an employee agent, which subsequently become unearned as a result of the termination or lapse of any policy or coverage."

It is evident that this provision acknowledges *some* obligation on the defendants' part to pay renewal commissions to *some* persons. The provision only *expressly* addresses, however, commissions earned under a preexisting contract, an "[a]gent's [e]mployment [a]greement," which previously had been earned but not credited to an "employee agent's" account at the time of the execution of the contract at issue in the present case. It is unclear whether this provision *implicitly* acknowledges a continuing obligation to pay

renewal commissions. It also is unclear whether the plaintiffs previously were employee agents who would have been entitled to renewal commissions under an agent employment agreement. Thus, the extent and applicability of *any* contractual obligation to pay renewal commissions to the plaintiffs in the present case is unclear.

To the extent that the plaintiffs claim that § 38a-709 must be incorporated as a term of the contract merely by virtue of a reference to "renewal commissions," irrespective of whether the contract *creates* an obligation to pay renewal commissions *to the plaintiffs*, we disagree. Section 38a-709 cannot be incorporated to construe the extent of the defendants' obligation under the contract to pay renewal commissions unless such an obligation exists thereunder. As we previously have explained, absent an express indication by the legislature; see footnote 24 of this opinion; we do not engraft laws onto a contract to create substantive obligations, enforceable by an action in contract, where no such obligation previously had existed.

Given, however, the ambiguities that we have identified in paragraph seven as to an obligation on the defendants' part under *this* contract to *these* plaintiffs to pay renewal commissions, it is not certain as a matter of law that the defendants were not so obligated. Indeed, the plaintiffs' affidavits attest that the policies subject to renewal commissions in this action are "policies on which, during the year before [their] termination, [they] had received commissions from [the defendants] based on their sale *or renewal*."[25] (Emphasis added.) Accord-

---

[25] Notably, the defendants did not contend before this court or the trial court that they never had paid renewal commissions to the plaintiffs, either pursuant to the type of preexisting agent's employment agreement referenced in the contract or under the contract at issue itself. Rather, the defendants merely contend in a footnote in their brief to this court that, "paragraph [seven] of the agreement facially refers only to payment of commissions (original and renewal) on pre-agent's agreement business during the agreement's term under the agreement's payment schedule; it is

ingly, the trial court improperly rendered summary judgment on the breach of contract count.

## III

## CUTPA CLAIM

Finally, we briefly address the ninth count of the complaint, alleging violations of CUTPA. It is undisputed that this count is dependent entirely on the allegations set forth in the other counts of the complaint and, therefore, its viability rises or falls on the viability of the other counts. Because we conclude in parts I and II of this opinion that the trial court improperly rendered summary judgment on counts five and eight of the complaint, alleging breach of contract for nonpayment of deferred compensation and renewal commissions, we also reverse the trial court's judgment as to the CUTPA count to the extent that it is dependent on those two counts.

The judgments are reversed in part with respect to counts five, eight and nine of the complaint and the case

not (as [the plaintiffs] contend in the [appellate] brief but in neither their complaint nor at the hearing on the parties' motion) a promise to pay renewal commissions either under § 38a-709 (c) or in perpetuity." We also note that, at oral argument before the trial court on their first motion for summary judgment, the defendants indicated that paragraph eleven of the contract provided for an independent agent's election of posttermination renewal commissions.

It must be underscored that, as the party moving for summary judgment, the defendants bore the burden of proving that, under the facts alleged, the plaintiffs could not prevail as a matter of law. See *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 314. The defendants' failure to establish that they previously had not paid any renewal commissions raised a question of fact as to a contractual obligation that would support the plaintiffs' cause of action, which weighed against rendering summary judgment. Moreover, although the plaintiffs did not reference expressly paragraph seven of the contract in their complaint, they had alleged in the complaint that they were entitled to renewal commissions under § 38a-709, they had argued before the trial court that the statute was engrafted as an implied term of the contract and they specifically had pointed the court to this provision at oral argument on the defendants' first motion for summary judgment.

is remanded with respect to these counts for further proceedings according to law; the judgments are affirmed in all other respects.

In this opinion the other justices concurred.