## HOSPITAL OF CENTRAL CONNECTICUT *v.* NEUROSURGICAL ASSOCIATES, P.C. (AC 33075)

DiPentima, C. J., and Robinson and Pellegrino, Js.

---

Argued September 10—officially released December 25, 2012

Robert D. Tobin, with whom were Thomas J. Riley and, on the brief, Bethany F. Haslam, for the appellant (plaintiff).

Edward T. Lynch, Jr., with whom, on the brief, was Steven Lapp, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, the Hospital of Central Connecticut, appeals from the summary judgment rendered in favor of the defendant, Neurosurgical Associates, P.C. On appeal, the plaintiff claims that the trial court improperly granted the defendant's motion for summary judgment as to its unjust enrichment and statutory theft counts. We agree with the plaintiff in part, and, therefore, reverse the summary judgment rendered in favor of the defendant as to the count of unjust enrichment.

The plaintiff commenced this action with a two count complaint alleging unjust enrichment and theft pursuant to General Statutes § 52-564.[1] The complaint contained the following factual allegations. On June 6, 2005, the parties entered into an agreement where the defendant agreed to provide neurological on-call coverage for the plaintiff.[2] In exchange for this coverage, the

---

[1] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[2] In his affidavit, Steven Hanks, the senior vice president and chief medical officer of the plaintiff, stated that the agreement between the parties originated in April, 2004, following the sudden retirement of a neurosurgeon. On April 19, 2004, the parties entered into an agreement for the provision of neurological services in exchange for a monthly payment of $8958.33. This initial agreement was extended through June 5, 2005. The parties then entered into the agreement described in the complaint.

plaintiff agreed to pay the defendant a monthly fee of $8333.33. On or about August 31, 2006, the agreement was renewed for one additional year and was subject to automatic renewals thereafter. The agreement also contained a termination provision with a notice requirement. The plaintiff sent the defendant a notice on or about August 3, 2007, terminating the agreement as of October 8, 2007, and welcoming the "[d]efendant's [physician[s'] continued active participation on the hospital's medical staff." This active participation required the defendant's physicians to provide on-call services without charge pursuant to the policies of the plaintiff. Despite the termination letter, the plaintiff mistakenly continued to pay a monthly fee to the defendant for a period of eight months, totaling $66,666.64. In a letter dated September 2, 2008, David R. Newton, the plaintiff's chief financial officer, demanded the return of $66,666.64. The defendant refused to repay the money.[3] The plaintiff also alleged, in its second count, that the defendant, intentionally and without authorization, had taken and withheld the funds from the plaintiff.

Thereafter, the defendant filed a motion for summary judgment and provided the court with a memorandum of law. Approximately one month later, the plaintiff filed a motion for summary judgment and attached a memorandum of law in support of its motion and in opposition to the defendant's motion. Following a hearing, the court issued a memorandum of decision denying the plaintiff's motion for summary judgment and granting the defendant's motion for summary judgment as to both counts of the complaint. Specifically, it concluded that "[t]he undisputed facts do not support a

[3] The defendant's physicians sent the following letter to Newton: "We have received your letter of September 2, 2008 regarding reimbursement of payments to [the defendant] for coverage [from] October 2007 through May 2008. We have provided coverage throughout that time, having been placed on the call schedule, and have been appropriately reimbursed by [the plaintiff] for this service."

cause of action for either unjust enrichment or civil theft." This appeal followed.[4]

"Summary judgment is a method of resolving litigation when pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried. . . . However, since litigants ordinarily have a constitutional right to have issues of fact decided by a jury . . . the moving party for summary judgment is held to a strict standard . . . of demonstrating his entitlement to summary judgment. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 534–35, 51 A.3d 367 (2012); *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 456, 52 A.3d 702 (2012); see also Practice Book § 17-49. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Mills* v. *The Solution, LLC*, 138 Conn. App. 40, 46, 50 A.3d 381, cert. denied, 307 Conn. 928, 55 A.3d 570 (2012); *Cornelius* v. *Rosario*, 138 Conn. App. 1, 6, 51 A.3d 1144 (2012).

"The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue . . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of

---

[4] We note that the plaintiff has appealed only from the judgment granting the defendant's motion for summary judgment and not from the denial of its motion for summary judgment.

fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Desrosiers* v. *Diageo North America, Inc.*, 137 Conn. App. 446, 451–52, 49 A.3d 233, cert. granted on other grounds, 307 Conn. 916, 54 A.3d 180 (2012); *Deutsche Bank National Trust Co.* v. *Shivers*, 136 Conn. App. 291, 295–96, 44 A.3d 879 (2012). "A material fact is a fact which will make a difference in the result of the case. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Internal quotation marks omitted.) *Vestuti* v. *Miller*, 124 Conn. App. 138, 142, 3 A.3d 1046 (2010); see also *Maltas* v. *Maltas*, 298 Conn. 354, 365, 2 A.3d 902 (2010) (court's function to decide whether issues of material fact exist). Guided by these principles, we turn to the specifics of the plaintiff's appeal.

I

The plaintiff first claims that the court improperly rendered summary judgment in favor of the defendant with respect to its unjust enrichment count. Specifically, the plaintiff argues that the court failed to consider the evidence in the light most favorable to the plaintiff, as the nonmoving party. It further contends that had the court done so, it would not have rendered summary judgment with respect to the unjust enrichment count. We agree with the plaintiff that the court

improperly rendered summary judgment with respect to this count.

We begin by setting forth the law regarding a claim of unjust enrichment. "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. . . . A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury,* 278 Conn. 557, 573, 898 A.2d 178 (2006); see also *American Express Centurion Bank* v. *Head,* 115 Conn. App. 10, 16, 971 A.2d 90 (2009); M. Taylor & D. Krisch, Encyclopedia of Connecticut Causes of Action (2009) p. 65.

The following additional facts are contained in the materials that were before the court in deciding the summary judgment motions. Steven Hanks, the senior vice president and chief medical officer for the plaintiff, submitted an affidavit stating that he had been involved in the negotiations between the plaintiff and the defendant. As a general matter, the plaintiff required all physicians on its staff to provide on-call coverage. The

physicians that comprised the defendant, Stephan C. Lange, Howard Lantner, Stephen F. Calderon and Bruce S. Chozick, were members of the plaintiff's active medical staff at all relevant times. Each had signed staffing privilege agreements detailing the rights and responsibilities of this status with the plaintiff. These responsibilities were set forth in the medical staff bylaws (bylaws) and the rules and regulations of the medical staff of the plaintiff (regulations) and were incorporated in the staffing privilege agreements signed by the individual physicians.

Article III, § 3 d, of the bylaws provides in relevant part: "Every application for staff appointment shall be signed by the applicant and shall contain the applicant's specific knowledge of every medical staff member's obligation to . . . participate in staffing the emergency service area and other special care units." Section II H of the regulations provides: "Each member of the active staff is expected to cover the emergency room for both staff service and unassigned private patients on a rotational basis as assigned. It is the staff member's responsibility to arrange appropriate coverage if unable to fulfill this obligation." At all relevant times, the defendant's physicians were members of the medical staff and were classified as associate attending staff.[5] The appointment letter specifically stated that the plaintiff's physicians were subject to the bylaws, regulations and policies of the hospital and medical staff.

Hanks, on behalf of the plaintiff, took the position that following the termination of the contract between

---

[5] Article IV, § 5, of the bylaws defined the term "active medical staff." The classification of "Associate Attending Staff" is described as follows: "Appointees to the associate attending staff shall be practitioners of ability and experience who have been certified by the board of their specialty. They shall demonstrate active participation in staff and department functions and in the educational program."

the plaintiff and the defendant, the defendant's physicians were obligated by the terms of the staff agreement, bylaws and regulations to provide on-call coverage. In exchange, the defendant's physicians received the ability to use the plaintiff's facilities, such as operating rooms, and the plaintiff's employees, such as nurses. The defendant's physicians continued to admit patients and to use the plaintiff's facilities and staff after the termination of the contract, from October, 2007 through July, 2008. Finally, according to Hanks' affidavit and other evidence, during the relevant time period, other physicians provided on-call neurological services to the plaintiff without cost.

In its memorandum of decision, the court concluded that summary judgment was appropriate for two reasons. First, the defendant provided on-call coverage to the hospital after the contract had been terminated and, thus, the plaintiff received the benefit of the defendant's services. Second, the defendant never intended to provide the services for free.[6] For these reasons, the court concluded that the undisputed facts did not support a cause of action for unjust enrichment and, therefore, it granted the defendant's motion for summary judgment.[7] We disagree with the trial court and conclude that it should have denied the defendant's motion.

The plaintiff presented documentary evidence, including the affidavit of Hanks and the bylaws and regulations of the plaintiff, to oppose the motion for summary judgment. It was undisputed that the plaintiff

[6] The court's statement appears to be based on the deposition of Lantner, which was attached to the defendant's motion for summary judgment.

[7] The court also noted that the contract was with the defendant and that the staffing agreements were with the defendant's individual physicians. We question the significance of this fact, particularly in light of the contract's terms that each of the defendant's physicians was required to apply for, receive and maintain a medical staff appointment with the plaintiff in accordance with the bylaws and regulations.

terminated the contract paying the defendant for on-call services. The plaintiff's evidence demonstrated that there was a genuine issue of material fact with respect to the obligation of the defendant's physicians to provide on-call services irrespective of the terminated contract. Specifically, article III, § 3 d, of the bylaws and § II H of the regulations required active staff members to provide such services in exchange for the ability to use the plaintiff's facilities and staff. "The privilege to admit and treat patients at a hospital can be critical to a doctor's ability to practice his [or her] profession and to treat patients. Both doctors and patients can suffer if otherwise qualified doctors are wrongly denied staff privileges. . . . Consequently, hospitals must treat physicians fairly in making decisions about their privileges because patients need physicians and they, in turn, need hospital privileges to serve their patients." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 333–34, 994 A.2d 153 (2010). While it is true that the defendant and its physicians were not supposed to be paid a monthly fee for providing on-call services following the termination of the contract, a factual issue exists as to whether they were required "to work for free." A fact finder may determine that, in exchange for providing on-call services, the defendant's physicians received the clinical privileges as provided in article VI of the bylaws.[8] Finally, we note that the plaintiff provided evidence that each physician of the defendant

---

[8] Article VI, § 1 c, provides in relevant part: "Each member of the medical staff shall have a list of delineation of clinical privileges approved by the department chief, the Staff Executive Committee and the governing body (Board of Directors). In recommending approval of clinical privileges for a given practitioner, the department chief should consider the practitioner's training, evidence of ongoing medical education and where validated external benchmarks exist, the volume of specific clinical activity by that practitioner in comparison to those benchmarks. Procedure or diagnosis-specific clinical outcome data, as available, should also inform the recommendations of the department chief for each practitioner's clinical privileges."

signed a staffing agreement in which he agreed to the terms of the bylaws and regulations, including the requirement of on-call coverage.

On the basis of the record before us, we conclude that the court improperly rendered summary judgment with respect to the plaintiff's unjust enrichment count. A genuine issue of material fact exists with respect to whether the defendant was unjustly enriched as a result of the payments to the defendant totaling $66,666.64 following the termination of the parties' contract. A fact finder could conclude that these payments were made in error and in addition to the obligation of the defendant's physicians to provide the on-call service, for which they already received the benefits of using the plaintiff's facilities and staff. Such a finding would support the elements of unjust enrichment, and, therefore, the defendant is not entitled to judgment as a matter of law. See, e.g., *Plato Associates, LLC* v. *Environmental Compliance Services, Inc.*, 298 Conn. 852, 862, 9 A.3d 698 (2010). We conclude, therefore, that the court improperly rendered summary judgment with respect to count one of the plaintiff's operative complaint.

II

The plaintiff next claims that the court improperly rendered summary judgment in favor of the defendant with respect to its statutory theft count. The undisputed facts demonstrate that the claim of statutory theft fails as a matter of law because there was no evidence before the court that the defendant intended to deprive the plaintiff of the money, a necessary element for the statutory theft cause of action. Accordingly, we conclude that the court properly granted the defendant's motion for summary judgment as to this count.

We begin with the legal principles of the cause of action for statutory theft. "Section 52-564 provides: Any

person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages. Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . A person commits larceny within the meaning of General Statutes § 53a-119 when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. An owner is defined, for purposes of § 53a-119, as any person who has a right to possession superior to that of a taker, obtainer or withholder." (Citation omitted; internal quotation marks omitted.) *Blackwell* v. *Mahmood*, 120 Conn. App. 690, 700, 992 A.2d 1219 (2010); see also *Whitaker* v. *Taylor*, 99 Conn. App. 719, 732, 916 A.2d 834 (2007).

Our Supreme Court has distinguished the tort of conversion from statutory theft as follows: "The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights. . . . Thus, [c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. . . . The term owner is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right. . . . It is not a technical term and, thus, is not confined to a person who has the absolute right in a chattel, but also applies to a person who has possession and control thereof. . . . Conversion can be distinguished from

statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Citations omitted; internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 770–71, 905 A.2d 623 (2006); see also *News America Marketing In-Store, Inc.* v. *Marquis*, 86 Conn. App. 527, 544, 862 A.2d 837 (2004), aff'd, 276 Conn. 310, 885 A.2d 758 (2005).

The dispositive issue for this claim is whether a genuine issue of material fact exists with respect to the element that distinguishes statutory theft from conversion, that is, whether the defendant intended to deprive another of property. The trial court concluded that there was no evidence of such intent. We agree.

The plaintiff's complaint simply alleged, in count two, that the defendant "intentionally and without authorization took and withheld the funds from the [p]laintiff."[9] Hanks stated in his affidavit that the defendant's physicians failed to inform the plaintiff that payment had continued after October, 2007. He further stated that the defendant refused to return the $66,666.64 after receiving the plaintiff's demand letter. As previously noted, the defendant's physicians sent a letter to the plaintiff's chief financial officer stating that they had provided coverage during the time period of October, 2007 through May, 2008, having been placed on the call schedule and "appropriately reimbursed by the [plaintiff] for this service."

---

[9] Our Supreme Court has stated that money can be the subject of both conversion and statutory theft. *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 771–72.

In his deposition, Lantner stated that all of the defendant's physicians were of the opinion that the plaintiff wanted to continue the arrangement, despite the termination of the contract in October, 2007. Every month that they received the payment, they provided the on-call services. Finally, after the payments had ceased, the defendant physicians downgraded their privileges at the plaintiff to "courtesy staff."[10]

We now turn to the case law with respect to the intent element of statutory theft. In *Lawson* v. *Whitey's Frame Shop*, 42 Conn. App. 599, 601, 682 A.2d 1016 (1996), rev'd in part, 241 Conn. 678, 697 A.2d 1137 (1997), the defendant, acting at the direction of the Hartford police department, towed the automobiles owned by the plaintiffs as a result of the substantial parking fines incurred by the plaintiffs. Allegedly acting pursuant to General Statutes § 14-150 (g) and after providing notice to the department of motor vehicles and the plaintiff, the defendant sold the vehicles for salvage. Id., 603. The plaintiffs then filed an action for conversion and a violation of the Connecticut Unfair Trade Practices Act, General Statutes §§ 42-110a through 42-110q. *Lawson* v. *Whitey's Frame Shop*, supra, 601. After finding in favor of the plaintiffs and awarding $50 per vehicle in compensatory damages, the court trebled that amount pursuant to § 52-564. In doing so, however, the court observed that § 52-564 "may . . . be inapplicable

---

[10] Article IV, § 8, of the bylaws provides: "The courtesy staff shall consist of practitioners qualified for staff membership who admit fewer than six patients to the hospital or to the ambulatory surgery unit each year. Members of the courtesy staff must be an active staff member of an accredited hospital in the State of Connecticut. Courtesy staff members shall be appointed to a specific department and must show evidence of participation in a continuing education program approved by the chief of that department. They shall not be eligible to vote or hold office on the medical staff. They will not be required to serve on hospital committees. They will not be required to pay hospital staff dues. They will be required to attend quarterly staff meetings of the medical staff."

because the defendant was acting under a claim of right
. . . ." (Internal quotation marks omitted.) Id., 605. We
determined that because the court did not find that
the defendant intended to deprive the plaintiffs of the
automobiles, and stated that the defendant was acting
under a claim of right, it was plain error for the court
to apply § 52-564 to that case. Id., 606–607.

In *Blackwell* v. *Mahmood*, supra, 120 Conn. App. 690,
we noted the significance of whether a defendant was
acting under a claim of right when faced with a claim
for statutory theft. In that case, the trial court did not
make a finding that the defendant was acting under a
claim of right. Id., 702. It made findings that the defen-
dant was dishonest. Id. "This case is distinguishable
from *Lawson* because in that case the trial court made
a clear finding in its memorandum of decision that the
defendant was acting under an honestly held claim of
right [and therefore it was plain error to award treble
damages pursuant to § 52-564]." (Internal quotation
marks omitted.) Id., 701.

The documents associated with the summary judg-
ment proceedings demonstrate that the defendant's
physicians believed that they received payment from
October, 2007 through May, 2008, for providing on-call
services. Lantner stated in his deposition that his time
had a value and that that value was not zero. The plain-
tiff failed to provide any evidence to contradict this
belief or to show anything but an honestly held claim
of right. In the context of summary judgment, "[i]t is
not enough for the moving party merely to assert the
absence of any disputed factual issue; the moving party
is required to bring forward . . . evidentiary facts, or
substantial evidence outside the pleadings to show the
absence of any material dispute. . . . Once met, the
burden shifts to the party opposing such a motion [to]
provide an evidentiary foundation to demonstrate the

existence of a genuine issue of material fact." (Citation omitted; internal quotation marks omitted.) *Tuccio Development, Inc.* v. *Neumann*, 114 Conn. App. 123, 126, 968 A.2d 956 (2009). In this case, the plaintiff failed to provide such evidence regarding the intent of the defendant or its physicians.

Finally, we are mindful that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated. . . . The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. . . . [E]ven with respect to questions of motive, intent and good faith, the party opposing summary judgment must present a factual predicate for his argument in order to raise a genuine issue of fact." (Internal quotation marks omitted.) *Gagnon* v. *Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 842, 888 A.2d 104 (2006); *Reynolds* v. *Chrysler First Commercial Corp.*, 40 Conn. App. 725, 731–32, 673 A.2d 573, cert. denied, 237 Conn. 913, 675 A.2d 885 (1996); see also *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 250, 618 A.2d 506 (1992). As we have stated, the plaintiff failed to provide the necessary factual predicate to raise a genuine issue of a material fact with respect to the intent to deprive element of statutory theft. Accordingly, we conclude that the court properly granted the defendant's motion for summary judgment as to the second count of the complaint.

The judgment is reversed only with respect to the count of unjust enrichment and the case is remanded for further proceedings according to law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.