******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HOSPITAL OF CENTRAL CONNECTICUT *v.*
NEUROSURGICAL ASSOCIATES, P.C.
(AC 36272)

Gruendel, Prescott and Bishop, Js.

Argued March 5—officially released August 4, 2015

(Appeal from Superior Court, judicial district of New Britain, Wiese, J.)

*Robert D. Tobin*, with whom were *Emily Casey* and, on the brief, *Thomas J. Riley* and *Paul Ciarcia*, for the appellant (plaintiff).

*Edward T. Lynch, Jr.*, with whom was *Stephanie P. Antone*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. For several years, the plaintiff, the Hospital of Central Connecticut, paid for emergency neurosurgical coverage pursuant to a contract with the defendant, Neurosurgical Associates, P.C. The central issue in this case is whether, by continuing to make monthly payments to the defendant after the plaintiff had terminated the parties' contract, the plaintiff unjustly enriched the defendant or the defendant properly retained all sums paid by the plaintiff following the termination because the defendant's physicians continued to be placed on the plaintiff's on call schedule and provided the same on call coverage posttermination as they had done during the pendency of the contract. Following a one day bench trial, the trial court rendered judgment in favor of the defendant on the plaintiff's unjust enrichment claim, from which judgment the plaintiff now appeals.[1]

The plaintiff claims on appeal that the trial court improperly concluded that the defendant was not unjustly enriched in light of the fact that the defendant continued to receive monthly payments from the plaintiff after the parties' contract was terminated. More specifically, the plaintiff challenges the court's determination that, by continuing to place the defendant's physicians on the on call schedule and continuing to pay the defendant for services provided posttermination, the plaintiff effectively agreed to continue the parties' arrangement regarding payment for on call coverage. The plaintiff also argues that the court failed to construe properly a requirement in the plaintiff's medical staff bylaws, which mandates that all physicians with active medical staff privileges are to provide emergency room coverage, as creating a separate contractual obligation that required the defendant's physicians to provide on call coverage without compensation. We conclude that the plaintiff has failed to show that the court abused its discretion in determining that the defendant was not unjustly enriched and, accordingly, affirm the judgment of the court.

The following facts, as found by the court in its memorandum of decision, and procedural history are relevant to this appeal. The plaintiff has approximately 550 physicians on its staff, approximately one quarter of whom are the plaintiff's employees.

Beginning in the spring of 2004, one of the plaintiff's staff neurosurgeons retired, leaving the plaintiff with only one neurosurgeon on its active medical staff. To ensure that a neurosurgeon was always available to attend to any urgent situation that might arise in its emergency room or during inpatient care, the plaintiff entered into a year long contract with the defendant beginning on April 19, 2004.

Pursuant to the contract, the defendant agreed to

provide, through its physicians, on call neurological services coverage for the plaintiff's emergency department and other areas of the hospital for two out of every three days in accordance with a schedule maintained by the plaintiff's chief of surgery. The contract further provided that, "[a]t no additional cost to the [plaintiff] and at its sole discretion, the [plaintiff] may increase [the defendant's] on-call coverage obligations under this [a]greement to twenty-four (24) hours per day, seven (7) days per week (i.e. 3 out of 3 days) upon fifteen (15) days prior written notice to the [defendant]." In exchange for providing the specified on call coverage, the plaintiff agreed to pay the defendant $8958.33 per month. The contract also provided that each of the defendant's physicians "must apply for, receive, and maintain a [m]edical [s]taff appointment and appropriate clinical privileges in accordance with the [m]edical [s]taff [b]ylaws, [r]ules and [r]egulations."

According to the plaintiff's bylaws and the rules and regulations promulgated thereunder, "courtesy staff" are "practitioners qualified for staff membership who admit fewer than six patients to the hospital or to the ambulatory surgery unit each year. Members of the courtesy staff must be an active staff member of an accredited hospital in the [s]tate of Connecticut."[2] "Active medical staff," on the other hand, are permitted to admit an unlimited number of patients and have additional responsibilities as set forth in the rules and regulations, including that they are "expected to cover the emergency room for both staff service and unassigned private patients on a rotational basis as assigned."

Prior to the execution of the contract in April, 2004, none of the defendant's physicians had "active medical staff" privileges with the plaintiff; they all maintained only "courtesy staff" privileges. To comply with the defendant's contractual obligations that its physicians obtain active medical staff status with the plaintiff, the defendant's physicians each executed individual agreements (staffing privileges agreements) with the plaintiff, in which they agreed to abide by the plaintiff's bylaws, rules and regulations.[3]

The plaintiff, as a matter of policy, generally did not pay its active medical staff for on call coverage because it believed that on call coverage is a requirement of the "active medical staff" designation and that a physician's opportunity to bill directly those patients seen at the hospital is adequate compensation. Additional compensation for on call coverage, however, above and beyond the other privileges associated with active medical staff status, was not expressly prohibited under the medical staff bylaws, rules and regulations or any provision of the individual staffing privileges agreements.

On June 6, 2005, the parties entered into a second year long contractual agreement in which the plaintiff

agreed to pay the defendant a monthly fee of $8333.33 for continued neurosurgical on call coverage. At the end of August, 2006, the parties again renewed their agreement for an additional one year period, subject thereafter to automatic renewal unless terminated by written notice.

At the beginning of August, 2007, the plaintiff, who recently had hired an additional staff neurosurgeon, sent the defendant notice that it wished to terminate the on call agreement effective October 8, 2007. The notice stated that the plaintiff would welcome the defendant's physicians' "continued active participation on our [m]edical [s]taff." After taking action to terminate the agreement, the plaintiff nevertheless continued to put the defendant's physicians on the monthly on call schedule, the defendant's physicians performed all on call duties as assigned, and the plaintiff continued to pay the defendant the same monthly fee it had paid for on call coverage under the most recent contract.

Sometime in late 2007 or early 2008, the plaintiff's chief medical officer met with the defendant's representative to discuss the defendant's role in providing on call coverage to the plaintiff. The defendant's representative made it clear that the defendant's physicians would not perform on call coverage without compensation, noting that other hospitals, including the defendant's primary hospital, Saint Francis Hospital, paid it for on call work. The plaintiff took the position that it was its policy not to compensate its staff physicians for on call services. Nevertheless, even after this meeting, the plaintiff continued to schedule the defendant's physicians for on call work and made monthly payments for those services for several additional months. The defendant received its last monthly payment on June 13, 2008. In total, from the stated termination date of October 8, 2007, until June 13, 2008, the defendant received $66,666.64 in payments from the plaintiff.

The plaintiff's chief financial officer sent the defendant a letter dated September 2, 2008, indicating that the plaintiff had inadvertently paid the defendant from October, 2007 through May, 2008, and demanding that the defendant return $66,666.64 to the plaintiff. The defendant refused to return the money, indicating in a return letter: "We have provided coverage throughout that time, having been placed on the [on] call schedule, and have been appropriately reimbursed by the [plaintiff] for this service." The plaintiff took the position that, pursuant to its existing rules and regulations, the defendant's physicians' continued participation as members of the active medical staff came with an expectation that the defendant's physicians would provide on call coverage without compensation.

The plaintiff thereafter commenced the present action. Following a one day trial, the court issued a memorandum of decision finding in favor of the defen-

dant on the sole remaining count of the complaint, which alleged unjust enrichment. See footnote 1 of this opinion. The court stated that it reached its decision on the basis of its examination of the circumstances and the conduct of the parties and reasoned as follows: "The court finds that the payments made to the defendant were not in error and were part and parcel of the parties' payment arrangement. Namely, the [plaintiff] received the benefit of [the defendant's] work and availability in exchange for paying it a monthly fee, in addition to allowing the use of its facilities and direct patient billing. This is the same arrangement [the defendant] operated under during the previous contract.

"The credible evidence demonstrates the following. The [plaintiff] continued to place the [defendant's] physicians on call after the notice of termination. Additionally, the [plaintiff's] claim that it no longer needed [the defendant's] services is not credible. The [plaintiff] knew that the [defendant's] physicians obtained [active medical] staff privileges only because of the contract and for the sole purpose of being paid for their professional services. The [defendant's] physicians did not induce the [plaintiff] into making these assignments or the continuing monthly payments. The [plaintiff] chose to continue to assign the physicians to on call duty and extend the mutually beneficial paid on call arrangement that the parties previously agreed to. In the meeting between [the parties] held in late 2007 or early 2008, [the defendant's principal] set forth [the defendant's] unequivocal position that no services would be performed without financial compensation. Nevertheless, the payments continued and the [plaintiff] continued to put [the defendant] on its schedule, fully aware of [the defendant's] payment demands in accordance with the previous arrangement. In so doing, the [plaintiff] received all the benefits of [the defendant's] work."

The plaintiff filed a motion for reargument in which it contended that (1) the court's conclusion that the payments were "part and parcel of the parties' payment arrangement" was inconsistent with the undisputed fact that the payment arrangement had been terminated, (2) the court's conclusion that the plaintiff intended or chose to extend the "mutually beneficial paid on call arrangement" was not supported by any evidence in the record, and (3) the court's finding that the plaintiff's claim that it no longer needed the defendant's services lacked credibility was inconsistent with its own factual findings. The court issued an order on October 28, 2013, stating that, after reviewing the motion for reargument and the objection thereto, the court reconsidered its decision, and the decision would "remain as articulated." This appeal followed.[4]

The plaintiff claims on appeal that the trial court improperly concluded that the defendant was not unjustly enriched, despite the fact that the defendant

kept payments that the plaintiff contends it inadvertently made to the defendant after the plaintiff had terminated the parties' contract for on call services, and despite an independent contractual obligation of the defendant's physicians to provide emergency room coverage without compensation pursuant to the individual staffing privileges agreements with the plaintiff. The defendant responds that the court correctly determined that it was not unjustly enriched because the payments that it received from the plaintiff following the termination of their contract amounted to reasonable compensation for the on call services that the defendant continued to provide for the plaintiff, services that the court specifically found the defendant's physicians had no independent obligation to provide free of charge. We agree with the defendant.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit [that] has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case [in which] the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Recovery [for unjust enrichment] is proper if the defendant was benefited, the defendant did not [perform in exchange] for the benefit and the failure [to perform] operated to the detriment of the plaintiff." (Internal quotation marks omitted.) *BHP Land Services, LLC* v. *Seymour*, 137 Conn. App. 165, 170, 47 A.3d 950, cert. denied, 307 Conn. 927, 55 A.3d 569 (2012); see also *National CSS, Inc.* v. *Stamford*, 195 Conn. 587, 597, 489 A.2d 1034 (1985) ("it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff" [internal quotation marks omitted]).

Our review of a trial court's conclusion regarding whether a defendant has been unjustly enriched is deferential. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 452, 970 A.2d 592 (2009). As explained by our Supreme Court, "[t]he court's determinations of whether a particular failure to [perform] was unjust and whether the defendant was benefited are essentially factual findings . . . that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) Id.

"We will reverse a trial court's exercise of its equitable powers only if it appears that the trial court's decision is unreasonable or creates an injustice. . . . [E]quitable power must be exercised equitably . . . [but] [t]he determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citation omitted; internal quotation marks omitted.) *Croall* v. *Kohler*, 106 Conn. App. 788, 791–92, 943 A.2d 1112 (2008).

Having carefully reviewed the record in the present case, we conclude that the court reasonably could have concluded, on the basis of the facts and circumstances presented, including the actions of the parties, that the defendant was not unjustly enriched. Although the plaintiff would have us view the present situation as a simple matter of overpayment for which it should be entitled to restitution; see 1 Restatement (Third), Restitution and Unjust Enrichment, Benefits Conferred by Mistake § 6, p. 59 (2011) ("[p]ayment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due"); such a view is not borne out by the record as a whole.

It is undisputed that the plaintiff continued to make monthly payments to the defendant, totaling $66,666.64, for eight months after the plaintiff had terminated its contractual obligation to make such payments in exchange for on call coverage. Although the court made no findings as to precisely why the plaintiff continued to make those payments despite having terminated its contract with the defendant, the court found that the payments "were not in error and were part and parcel of the parties' payment arrangement." We construe this finding as an acknowledgement that the plaintiff continued to pay the defendant in the same manner that it had done for years because the physicians of the defendant continued to be placed on the schedule and provided on call coverage as requested. As the court expressly found, the defendant had done nothing to induce the plaintiff to make the additional payments nor had it sought to have its physicians placed on the monthly on call schedules following the termination of the contract. The plaintiff does not challenge those findings.

The continuation of payments by the plaintiff undoubtedly amounted to a benefit conferred on the defendant. For purposes of resolving the plaintiff's unjust enrichment claim, however, the court properly focused its consideration not on the benefit conferred by the plaintiff, but on whether the defendant had pro-

vided some reciprocal benefit to the plaintiff. In other words, it considered whether the defendant was justified in retaining the benefit conferred by the plaintiff because the defendant performed in exchange for that benefit by continuing to provide the same on call services that it had provided to the plaintiff for years pursuant to the parties' express contract. The court found that the plaintiff's argument that it no longer needed the defendant's services was not credible, and that finding is supported by the simple and undisputed fact that the defendant's physicians continued to be placed on the on call schedule. In sum, the court reasonably found that the defendant's physicians provided valuable and necessary on call coverage as scheduled, and, therefore, the plaintiff's continued payments could not reasonably be viewed as inequitable because they simply extended the parties' mutually beneficial relationship, a relationship that was initiated by the plaintiff at the bargained for rate.

The plaintiff nevertheless argues that it was entitled to the very same on call services from the defendant's physicians without compensation and, thus, that any payments retained by the defendant enriched the defendant to the detriment of the plaintiff. In support of its argument, the plaintiff references portions of the individual staffing privileges agreements executed by the defendant's physicians in conjunction with the on call agreement between the plaintiff and the defendant. The staffing privileges agreements were not terminated at the same time as the parties' on call agreement and remained in effect until the defendant's physicians voluntarily terminated those agreements by reverting to courtesy staff status when the dispute over on call compensation arose. According to the plaintiff, the court incorrectly concluded that there was no express requirement in the plaintiff's medical staff bylaws or rules and regulations that mandated that all physicians with active medical staff privileges had to provide on call coverage without compensation, and that whether a physician was compensated was a matter of policy, not a contractual obligation. We agree with the court's conclusions.

"The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage [if] it can be sensibly applied to the subject matter of the contract. . . . [If] the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . It is well established that [if] there is definitive contract language, the determination of what the parties intended by their contractual commitments is

a question of law. . . . It is axiomatic that a matter of law is entitled to plenary review on appeal." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010).

Pursuant to the staffing privileges agreements, the defendant's physicians unambiguously agreed to comply with the plaintiff's medical staff bylaws, rules and regulations. Article III, section 3 (d) of the bylaws requires that all applications for staff appointment contain an acknowledgement of "every medical staff member's obligations . . . to participate in staffing the emergency service area and other special care units." Article IV, section 5 of the bylaws provides that all active medical staff will "assume all the functions and responsibilities of membership on the active medical staff, including, *where appropriate*, emergency service care and consultation assignments." (Emphasis added.) Finally, section II, subsection H of the medical staff rules and regulations provides: "Each member of the active [medical] staff is expected to cover the emergency room for both staff service and unassigned private patients on a rotational basis as assigned."

Compensation, however, is not addressed in any of the previously quoted provisions. The plaintiff has pointed to no language that reasonably can be construed as creating a contractual obligation on the part of the defendant or its physicians to provide emergency on call coverage free of charge. Indeed, the bylaws are silent as to how often an active medical staff member would be obligated to provide on call services at the hospital, a fact that any physician with a busy private practice would undoubtedly wish to know before committing to such an agreement. As the court found in its decision, and as acknowledged by the plaintiff's chief medical officer at trial, nothing in the staff privileges agreements addresses whether a physician will be paid for providing on call services; that is a matter of policy left to the discretion of the plaintiff. The plaintiff was well aware of the defendant's position that it expected to be paid for on call coverage. Prior to execution of the on call agreement, the defendant's physicians were members of the plaintiff's courtesy staff and had no emergency coverage obligations with the plaintiff. They joined the hospital's active medical staff in order to be able to fulfill their staffing obligations under the on call agreement, pursuant to which they were to be paid for on call coverage. The plaintiff had no reasonable expectation that the defendant's physicians would remain on the active medical staff if they were no longer compensated for on call services and, in fact, when the plaintiff stopped paying for those services, the defendant's physicians immediately reverted to courtesy status.

We conclude that the plaintiff has failed to show that,

in balancing the equities, the court abused its discretion by concluding that the defendant had not been unjustly enriched. Although, as a general rule, "one who pays money to another by mistake as to the existence of the obligation or the validity of it, in such circumstances that the payment does not amount to a waiver, is entitled to recover the amount paid"; 66 Am. Jur. 2d 779, Restitution and Implied Contracts § 124 (2011); the trial court did not abuse its discretion by determining that the defendant in the present case did not enrich itself to the detriment of the plaintiff by retaining what the plaintiff alleged were inadvertent payments, because it provided a return benefit of equal value to the plaintiff in the form of continued on call coverage.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This matter previously was before us on an appeal by the plaintiff from the trial court's granting of summary judgment on the two count complaint in favor of the defendant. We affirmed the court's decision to grant summary judgment with respect to the plaintiff's count alleging statutory theft pursuant to General Statutes § 52-564. See *Hospital of Central Connecticut* v. *Neurosurgical Associates, P.C.*, 139 Conn. App. 778, 788, 57 A.3d 794 (2012). We reversed, however, the court's decision to grant summary judgment with respect to the plaintiff's unjust enrichment count. See id.

[2] The trial court found that the defendant's physicians were all active medical staff members of Saint Francis Hospital in Hartford.

[3] The staffing privileges agreements comprise a reapplication for appointment to the medical staff signed by the physician and a letter signed by the plaintiff's agent accepting the application for a specified appointment period. The reapplication contains a provision in which the physician agrees "to abide by the [m]edical [s]taff [b]ylaws and [r]ules and [r]egulations of the [plaintiff] and to comply with the requirements of my medical staff appointment for meeting attendance, continuing education credits, participation in teaching activities and committee assignments as outlined in those documents."

[4] We note that on June 12, 2014, the plaintiff filed a motion for articulation asking the trial court to answer (1) whether the parties' on call agreement was terminated by the plaintiff's August, 2007 notice letter, (2) whether coverage of the emergency room as set forth in the plaintiff's bylaws, rules and regulations was solely a matter of policy or a contractual obligation that a doctor assumed under the staffing privileges agreement, and (3) whether the staffing privileges agreement survived the termination of the on call agreement. The court denied the motion, stating that its "memorandum of decision is fully articulated." The plaintiff did not file a motion pursuant to Practice Book § 66-7 asking this court to review that decision.